**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

PARIMAL,[1]
     *Plaintiff*,

    v.

MANITEX INT'L, INC.,
     *Defendant.*

No. 3:19-cv-1910 (OAW)

**<u>RULING ON MOTIONS FOR SUMMARY JUDGMENT</u>**

This case is before the court upon the cross motions for summary judgment filed by Plaintiff (with its supporting memorandum, "Plaintiff's MSJ"), *see* ECF Nos. 132 and 133, and by Defendant (with its supporting memorandum, "Defendant's MSJ," and together with Plaintiff's MSJ, "Motions"), *see* ECF Nos. 138 and 140.  The court has reviewed the Motions; each party's opposition to the opponent's motion, *see* ECF Nos. 148 and 151; each party's reply in support of its own motion, *see* ECF Nos. 159[2] and 160; all statements of material facts, *see* ECF Nos. 134, 139, 149, and 152;[3] and the record in this matter and is fully advised in the premises.  For the reasons discussed herein, Defendant's Motion is **GRANTED in part and DENIED in part;** and Plaintiff's Motion is **GRANTED in part and DENIED in part.**

---

[1] In the complaint, Plaintiff notes that this is his complete, legal name.
[2] Plaintiff filed two replies, but the one filed at ECF No. 158 was apparently filed in error, as it consists of only the page certifying service.  The court therefore has disregarded that filing.
[3] Certain portions of the factual record have been sealed, *see* ECF Nos. 167 and 170, and the filings relevant to the Motions have been redacted accordingly.  The court has reviewed the unredacted filings, *see* 136, 137, 144, 150, but will refer only to the public, redacted versions during the course of this ruling.

1

I.   **BACKGROUND**

Because there are several facts in this case, the court will begin by describing the parties' relationship, generally, and later will add detail, where necessary or helpful.

A.   **Overview**

Defendant is a corporation organized under the laws of the state of Michigan.  ECF No. 104 at 11.  Plaintiff is an individual with professional experience in mergers and acquisitions.  ECF No. 152, ¶ 45 and response.  From February 2018 through September 2018, Plaintiff worked as a consultant for Defendant.  ECF No. 149, ¶ 1 and response.

In the summer of 2018, Defendant and Plaintiff negotiated an offer of full-time employment for Plaintiff.  ECF No. 152, ¶ 3 and response.  Plaintiff was a full-time employee at Defendant as of September 1, 2018.  *Id.* ¶ 12 and response.  Defendant terminated Plaintiff effective July 31, 2019.  ECF No. 152 ¶ 39 and response.  Plaintiff filed this action on December 4, 2019, and amended the complaint on February 24, 2020.  ECF Nos. 1 and 23.   Defendant answered the complaint and asserted several counterclaims against Plaintiff on April 8, 2021.  ECF No. 104.  All claims and counterclaims arise from Plaintiff's period of employment with Defendant.

B.   **The Terms of Employment**

While serving as Defendant's CEO, David Langevin negotiated Plaintiff's offer of employment.  ECF No. 152 ¶¶ 3, 5 and responses.  It is disputed whether Defendant's General Counsel, Marvin Rosenberg, also participated in the negotiation.  *Id.* ¶ 5 and response.  Plaintiff makes clear that he was negotiating on his own behalf without counsel.  *Id.* ¶ 4 and response.  Plaintiff received the offer via an offer letter ("Offer Letter"), which

was appended to a cover letter ("Cover Letter").  *Id.* ¶ 7 and response.  Plaintiff signed

the Offer Letter on August 17, 2018.  *Id.* ¶ 10 and response.

The precise terms of Plaintiff's employment are the subject of much dispute.

Defendant contends that the Offer Letter contains the complete and accurate terms of

Plaintiff's employment.  In fact, the Cover Letter concludes by noting, "Please review the

attached offer letter, and I look forward to your joining the Manitex team as Executive Vice

President in accordance with **the terms of your offer letter.**"  ECF No. 138-22 at 2

(emphasis added).  Plaintiff, however, asserts that additional terms were discussed with

(and were agreed upon by) Mr. Langevin, though they do not appear in the Offer Letter,

nor in the Cover Letter.  ECF No. 152 ¶¶ 7–9 and responses.

### 1.    General Terms

According to the Offer Letter, Plaintiff was hired as Executive Vice President with

$300,000 per year in base pay.  ECF No. 138-22 at 3.[4]  The Offer Letter stated that

Plaintiff's compensation was intended to reflect his initial full-time assignment in Italy; the

parties agreed that Plaintiff's salary upon his return to the United States would reflect his

assigned duties at that point, and would be in line with other senior executives.  *Id.*

Plaintiff's initial duties included supervising a subsidiary in Italy (the "Italian Subsidiary")

and developing a relationship with Tadano, Ltd. ("Tadano"), one of Defendant's investors.

*Id.*; ECF No. 152 ¶ 102 and response.

The Offer Letter specifically stated that Plaintiff's employment would be at-will.

ECF No. 138-22 at 4.  However, Plaintiff asserts conversations with Mr. Langevin caused

---

[4] Reference to ECF No. 138-22, which is a copy of the Cover Letter and the Offer Letter, will use the page numbers assigned by the court's electronic filing system, CM/ECF, since the document does not have internal pagination.

him to believe that his employment would be long-term, ECF No. 152 ¶ 16 and response, despite language in the Offer Letter that "nothing in this letter should be construed as creating an employment contract for a definite period of time as all employees of the Company are employed at - will", ECF No. 138-22 at 4.  Plaintiff further avers that his salary was not expected to be reduced upon his return from Italy, based on explanations from Mr. Langevin that contrary language in the Offer Letter only aimed to appease a certain executive whose base salary was lower than $300,000.  ECF No. 152 ¶ 18 and response.  Plaintiff claims that Mr. Langevin reiterated this assurance in May or June of 2019.  *Id.*; *see also* ECF No. 152-1 ¶ 16.

From September 2018 through July 2019, Plaintiff was paid his salary in accordance with the terms stated in the Offer Letter.  *Id.* ¶ 19 and response.  His salary was not reduced during the time he was employed by Defendant, even after his return from Italy.  *Id.*

## 2.   Bonus

The Offer Letter stated that Plaintiff would be eligible to participate in "the Company's" incentive bonus plan ("Bonus Plan") in accordance with the terms thereof. ECF No. 138-22 at 3.  "Company" is defined within the Offer Letter as Defendant, Manitex International.  *Id.*  Plaintiff asserts, though, that Langevin guaranteed Plaintiff's first-year bonus would be at least 75% of his target bonus (which was equal to Plaintiff's salary), despite the omission of the guarantee in the Offer Letter.  ECF No. 152 ¶ 27 and response. He also alleges that Mr. Langevin promised him a change of control benefit and a success fee, should Defendant be sold, *id.* ¶ 70 and response, though these terms appear in the

cover letter within the context of acknowledging that Defendant did **not** include them in the offer, ECF No. 138-22 at 2.[5]

At the end of 2018, however, Defendant's Compensation Committee (an arm of Defendant's Board of Directors), which administered the Bonus Plan, determined that, according to the terms of the Bonus Plan, Plaintiff's bonus would be based upon the performance of Defendant's European division, which in 2018 was not strong enough to justify any bonus. *Id.* ¶¶ 22–35 and responses. Plaintiff received a discretionary bonus of $50,000 for 2018. *Id.* ¶ 36 and response; *see also* ECF No. 152-2 at 7–8.[6]

Plaintiff asserts that the calculation of his bonus was incorrect even under the terms of the Bonus Plan and the Offer Letter, since Plaintiff's bonus should have been based upon Defendant's overall corporate performance, and not just on the performance of the European division. ECF No. 152 ¶ 27 and response. Plaintiff asserts that he and Mr. Langevin specifically discussed this point and agreed Plaintiff's bonus would be based on company-wide performance. ECF No. 152-3 at 7. He also points out that the Offer Letter says "the Company's" bonus plan, without reference to the European division. *Id.* Plaintiff further asserts that he was informed by Langevin in April or May 2019 at a trade show in Germany that his bonus would be lower than promised. ECF No. 152-1 ¶ 31.

---

[5] Specifically, the cover letter notes that an offer letter is attached, and the body of the cover letter contains only two other paragraphs. One states (in part), "I understand your desire to have an opportunity to participate, on a separate fee basis, if at some future date, the Company were to be sold. Because such circumstances are not now at hand, and may not be presented for some time, we **do not** think this is an appropriate juncture for the company to make such a commitment." ECF No. 138-22 at 2 (emphasis added). The other states (in part), "I also recognize your request for a 'change of control' benefit to protect you and other key employees in the event that a 'change in control' were to take place, and your employment circumstances were to be affected. . . . I will recommend to the Compensation Committee that, **at an appropriate time, consideration be given to including such a benefit** for key employees." *Id.* (emphasis added).

[6] Transcripts of deposition testimony will also use the pagination assigned by CM/ECF, as the excerpts do not have continuous internal pagination.

He claims Mr. Langevin said he would find alternative means to make up the bonus compensation. *Id.*

Plaintiff did not receive a bonus for 2019 because the terms of the Bonus Plan require an employee to be employed through the end of the year in order to be eligible for any such bonus. ECF No. 152 ¶¶ 40–41 and responses.

### 3. Advance

Plaintiff was living in Connecticut at the time he accepted Defendant's offer. *Id.* ¶ 11 and response. His Offer Letter promised to pay reasonable relocation expenses up to $60,000 (including the brokerage fee associated with the sale of Plaintiff's Connecticut home), as his position was to be based in Georgetown, Texas. ECF No. 138-22 at 3. In January 2019, this term was amended in a separate letter (the "Advance Letter"), in which Defendant agreed to advance Plaintiff a total of $120,000, half of which was the amount promised in the Offer Letter (to cover brokerage fees related to the sale of Plaintiff's Connecticut residence) and the other half of which was for general relocation costs. ECF No. 152 ¶¶ 77–78 and responses. However, if Plaintiff did not sell his Connecticut residence within sixteen months of the date of the Advance Letter, Plaintiff would be obligated to return the $60,000 intended to cover his brokerage fees. *Id.* ¶ 80 and response. Plaintiff also was obligated to return any portion of the advance that was not spent on his relocation expenses. *Id.* ¶ 79 and response.

Plaintiff used $10,000 of the advance to buy down the mortgage rates for his new home in Texas, and $50,000 for the down payment on that house. *Id.* ¶ 82 and response. His Connecticut residence was not sold within the sixteen-month period specified in the Advance Letter, but he did not return the $60,000. *Id.* ¶¶ 83–84 and responses. However,

Plaintiff notes he sold his Connecticut home after initiating this action (and after expiration of the sixteen-month period specified in the Advance Letter) . *Id.*

In Plaintiff's expense report covering February and March of 2019, he reported spending $31,282.89 in business and relocation expenses. *Id.* ¶ 87 and response. Defendant denied four of those reported expenses totaling $5,368.43,[7] though Plaintiff asserts that he was never told any of his expenses had been denied. *Id.* ¶ 89 and response. In fact, it appears that General Counsel Rosenberg approved those expenses, but for reasons never fully explained in the briefs, Defendant's Corporate Secretary still has declined to approve them, and Defendant still contends they are not owed to Plaintiff. ECF No. 138-6 at 1–3; ECF No. 138-33 at 6–7. Plaintiff asserts that these were all proper and reasonable relocation or business expenses. ECF No. 152 ¶¶ 89–91 and responses.

Defendant has not reimbursed Plaintiff for any of the expenses, including those it approved. *Id.* ¶ 95 and response. Defendant's accounting of the advanced money indicates that it is Plaintiff who owes Defendant $34,085.54 (the difference between the $60,000 Plaintiff has not returned pursuant to the terms of the Advance Letter, and the $25,914.46 of expenses approved by Defendant). *Id.* ¶ 94 and response.

## C.    Laptop

Defendant provided Plaintiff with a laptop while he was its consultant. ECF No. 149 at ¶ 2 and response. There were no apparent conditions attached to use of the laptop at the time Defendant provided it. ECF No. 152-1 ¶ 8. After Plaintiff was terminated, and after Plaintiff had raised claims related to his termination, Defendant's human resources

---

[7] Defendant denied a $423 expense for shipment of wine; a $1,044 mileage expense (Westport, CT, to Austin, TX); an annual $575 American Express fee; and a $3,326.43 expense for airfare to Italy in April and May of 2019. ECF No. 152 ¶¶ 90–92 and responses.

department sought the return of the laptop, but Plaintiff has retained it because of his outstanding claims against Defendant.  ECF No. 152 at ¶¶ 148–150 and responses; ECF No. 152-1 ¶ 35.   Defendant asserts it has incurred costs to replace the unreturned laptop. ECF No. 152  ¶ 153.

### D.     Alleged Disloyalty

For an unspecified period of time, but before he consulted for Defendant, Plaintiff worked for Terex Corporation ("Terex"), one of Defendant's investors.   *Id.* ¶¶  44, 103 and responses.  His employment at Terex terminated in March 2018.  *Id.* ¶ 44.[8]  After he no longer worked at Terex, Plaintiff suggested to Brian Henry, a Terex senior executive, that Terex should engage Plaintiff to help Terex sell its Demag Mobile Cranes business ("Demag") to Tadano in exchange for a $1 million–1.5 million fee.  *Id.* ¶ 47 and response. It is disputed how that negotiation progressed; Defendant asserts that Mr. Henry never accepted the proposal or even pursued it further, but Plaintiff asserts that conversations continued over several weeks, and that Mr. Henry actually offered to pay Plaintiff $10,000 per month to prevent Plaintiff from accepting another professional offer.  *Id.*, ¶ 48 and response.   It is undisputed that Terex never made Plaintiff a formal written offer in connection with the Demag sale, though Plaintiff asserts that once he had accepted the position with Defendant, there was no point in formalizing any arrangement between Terex and Plaintiff.  *Id.* ¶ 51 and response.[9]

---

[8] Terex permitted Plaintiff to begin consulting for Defendant before his employment at Terex ended.  ECF No. 152-1 ¶ 7.

[9] Terex's CEO from that time also has provided deposition testimony that some weeks after Plaintiff first broached the idea of helping Terex sell Demag, Plaintiff called him to say he had an offer of employment from Defendant that, if accepted, would preclude him from advising Terex in the Demag transaction, and that the CEO encouraged Plaintiff to accept Defendant's offer.  ECF No. 152-6 at 4.

On September 14, 2018, shortly after his start date working for Defendant, Plaintiff signed a document affirming that he had received the employee handbook, that he had read it, that he fully understood it, and that he agreed to be bound by it.  ECF No. 149 p.11 ¶ 6.  The handbook instructs that employment with Defendant was expected to be an employee's primary employment, and that any second job or outside activity should not interfere with the employee's duties as performed for Defendant.  *Id.* p. 12 ¶¶ 7–8.  It requires associates to disclose to Defendant's human resources department any potential conflicts of interest.  *Id.* p. 12 ¶ 9.

Defendant accuses Plaintiff of agreeing to help a competitor of Tadano's ("Competitor") purchase Demag after he had already started working for Defendant and after he knew that Tadano was interested in purchasing Demag.  ECF No. 152 ¶ 103–05 and responses.  However, Plaintiff asserts that Competitor actually was Defendant's possible strategic associate (and not a competitor), and that Mr. Langevin and Competitor were working together as late as May 2019.  *Id.*  It is undisputed that after Plaintiff started his employment with Defendant, he signed the Terex Corporation Confidentiality Agreement on or about October 31, 2018, *id.* ¶ 107 and response, and that sometime around November 2018, Plaintiff submitted a term sheet for Competitor's purchase of Demag, *id.* ¶ 108 and response.  It also is undisputed that Plaintiff never informed Defendant he was working with Competitor on the Demag sale.  *Id.* ¶ 111 and response.

At the same time, Plaintiff asserts that his work with Competitor was not in conflict with his duties to Defendant.  *Id.* ¶ 104 and response.  He implies that facilitating the sale of Demag was in Defendant's interest, since Terex was a 5% owner in Defendant.  *Id.* ¶ 105 and response.  Plaintiff also gave deposition testimony that Terex's then-CEO had

asked him to coordinate a back-up option with Competitor (in case the Tadano deal could not be completed).  ECF No. 138-21 at 6–7.  Plaintiff further notes that Mr. Langevin told him that Langevin did not want Tadano to acquire Demag, because the transaction would distract Tadano from fostering its relationship with Defendant.  ECF No. 138-19 at 12.

In February 2019, Tadano purchased Demag from Terex.  ECF No. 152 ¶ 115 and response.  Defendant did not learn of Plaintiff's involvement with Competitor until after Plaintiff's termination.

### E.    Termination

Plaintiff's duties for Defendant required him to spend a substantial amount of time in Italy working with Italian Subsidiary.  *Id.* ¶¶ 13, 116 and responses.  Initially, he commuted between Italy (where Defendant rented him an apartment) and Connecticut (still his primary residence at that time).  *Id.* ¶ 14, 120 and responses.  Once he moved to Austin, Texas, in February 2019, he commuted from Texas to Italy.  *Id.* ¶ 15 and response.  Plaintiff asserts that he continued to have an apartment in Italy until April 2019.  *Id.*

In his first six months with Defendant, the Italian Subsidiary's financial performance did not improve.  *Id.* ¶ 125 and response.  The Italian Subsidiary did not meet its financial goals for 2018, and it was not on track to meet its financial goals in 2019.  *Id.* ¶¶ 126–27. Defendant alleges that Plaintiff ceased commuting to Italy in April 2019 and gave up his apartment there and that Plaintiff refused the office he was given in Defendant's Texas facility, and so was instructed to work from home.  *Id.* ¶130–35 and responses.  Plaintiff disputes all these allegations; he asserts that he continued to commute to Italy after April 2019, but could no longer keep an apartment there because Mr. Langevin refused to sponsor him for a work visa, and Plaintiff objects to the allegation that he refused the

proffered office; he says he raised the issue with Langevin, who agreed that the office did not appropriately reflect Plaintiff's position, and who told him to work from home until a more suitable situation could be arranged.  *Id.*; *see also* ECF No. 152-7 at 5.

Defendant asserts that Langevin decided to transition Plaintiff to a different role in or around April 2019, but Plaintiff responds that there was no transition and any new duties were in addition to his responsibilities with respect to the Italian Subsidiary.  ECF No. 152 ¶ 136 and response.  Defendant contends that there simply was not enough work for Plaintiff in his new role, and the company could not afford Plaintiff's salary.  *Id.* ¶ 137– 38.  Plaintiff disputes both of these contentions as well.  *Id.*

In July 2019, Mr. Langevin informed Plaintiff that he was being terminated because Defendant was uneasy about the market and was trying to conserve cash.  *Id.* ¶ 140–41 and responses.  Plaintiff, though, asserts that this justification for his termination is pretextual.  *Id.* ¶ 141 response.  More specifically, Plaintiff asserts that he was wrongfully terminated because he had questioned Defendant's accounting practices, which he asserts were illegal under United States securities laws.  ECF No. 151 at 19.  The court need not detail the specifics of these accounting practices, but it is relevant to the following discussion that Defendant already was under investigation by the SEC for the same or similar billing practices.  ECF No. 138-19 at 15–16.  Plaintiff asserts that in Spring 2019, he discovered that the Italian Subsidiary's practices were even more troubling than what was already known to Defendant and the SEC.  *Id.* at 14; ECF No. 152-1 ¶ 35. Plaintiff asserts that he raised the issue with Mr. Langevin and Defendant's CFO, both of whom told him to phase out the practice gradually rather than stopping it immediately. ECF No. 138-21 at 18; ECF No. 152-1 ¶ 35.  Plaintiff further asserts that when he asked

for those instructions in writing in May 2019, the CFO told him, "You know I can't do that." ECF No. 138-21 at 18.

### F.    Claims

Plaintiff asserted seven claims against Defendant: breach of contract; promissory estoppel; breach of implied covenant of good faith and fair dealing; fraudulent misrepresentation; negligent representation; wrongful termination; and violation of the Connecticut Unfair Trade Practices Act ("CUTPA").  *See* ECF No. 23.  The CUTPA claim was dismissed, but all other claims remain active.  *See* ECF No. 102.  Defendant asserted four counterclaims against Plaintiff: breach of contract; breach of fiduciary duties; violation of the Texas Theft Liability Act; and conversion.  ECF No. 104.  Each of Defendant's counterclaims remains active.  Defendant has moved for summary judgment on all ten active claims and counterclaims.  Plaintiff has moved for summary judgment on only the second, third, and fourth counterclaims.

## II.    LEGAL STANDARD

### A.    Summary Judgment

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  The movant bears the burden of demonstrating that there is no genuine issue of material fact. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121,

124 (2d Cir. 2002) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1535 (2d Cir.1997)).  If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Id.*

To defeat a summary judgment motion, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998).  Rather, the nonmoving party must point to "specific facts in dispute to show that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," then summary judgment may still be granted.  *Horror Inc. v. Miller*, 15 F.4th 232, 240–41 (2d Cir. 2021).

When the nonmoving party ultimately will bear the burden of persuasion at trial, the moving party may show that summary judgment is appropriate in two ways: (1) by submitting evidence that negates an essential element of the opposing party's claim, or (2) by demonstrating that the opposing party's evidence is insufficient to establish an essential element of their claim.  *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

When reviewing a summary judgment motion, the court construes the cited evidence in the light most favorable to the nonmoving party and "resolves all ambiguities and draws all reasonable inferences against the moving party."  *Horror*, 15 F.4th at 240.

### B.    Choice of Law

A federal court presiding over a diversity action applies the choice-of-law provisions of the forum state.  *See Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir.1999) ("Federal courts exercising diversity jurisdiction must apply the choice of law rules of the forum state . . . .").  "The threshold choice of law question in Connecticut . . . is whether there is an outcome determinative conflict between the applicable laws of the states with a potential interest in the case.   If not, there is no need to perform a choice of law analysis, and the law common to the jurisdictions should be applied."  *Lumbermens Mut. Cas. Co. v. Dillon Co.*, 9 F. App'x 81, 83 (2d Cir. 2001).  However, if there *is* an outcome-determinative conflict, courts apply the laws of the state with the most significant relationship to the parties and to the event at issue, in accordance with the Restatement (Second) of Conflict of Laws.  *See Sadowski v. Dell Computer Corp.*, 268 F. Supp. 2d 129, 134 (D. Conn. 2003) (noting that Connecticut follows the "most significant relationship" test).  In determining which state has the most significant relationship, courts consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  *Dugan v. Mobile Med. Testing Servs., Inc.*, 265 Conn. 791, 802 (2003).  Federal courts applying Connecticut law also have found it appropriate to apply the "internal affairs doctrine," as is consistent with the Restatement, which provides that "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation . . . ."  *Nymbus, Inc. v. Sharp*, No. 3:17-CV-1113 (JAM), 2019 WL

692938, at *4 (D. Conn. Feb. 19, 2019) (quoting *NatTel, LLC v. SAC Cap. Advisors LLC*, 370 F. App'x 132, 134 (2d Cir. 2006)).

## III.   DISCUSSION

First, the court will address the arguments pertaining to Plaintiff's claims as laid out in Defendant's summary judgment motion; then it will address Defendant's counterclaims.

### A.   Breach of Contract

Given Defendant's citation to Connecticut law and Plaintiff's citation to Defendant's MSJ, the parties both appear to conclude that Connecticut law applies to this claim.  The court agrees.  Connecticut is where Plaintiff resided throughout his employment negotiations, and where he signed the Offer Letter, therefore, it has the most significant relationship to the formation of his employment contract.  Under Connecticut law, "[t]he elements of a breach of contract action are 'the formation of an agreement, performance by one party, breach of the agreement by the other party[,] and damages.'" *Rosato v. Mascardo*, 82 Conn. App. 396, 411 (Conn App. Ct. 2004) (quoting *Bouchard v. Sundberg*, 80 Conn. App. 180, 189 (2003)).

Plaintiff asserts that Defendant breached the terms of his employment by failing to make all the payments and to reimburse all the costs it was obligated to pay.  The complaint does not specify what payments Defendant failed to make, but since it is undisputed that Plaintiff received his full base salary for the entire time he was employed by Defendant, the court infers that the claim is based upon Defendant's failure to pay him

a bonus and to reimburse all the costs reported on Plaintiff's expense report for February and March.[10]

Defendant asserts that it is entitled to summary judgment on this claim because the Offer Letter is a fully-integrated contract and therefore, regardless of what Plaintiff may have discussed with Langevin leading up to his signing the Offer Letter, Defendant only was obligated to pay the remuneration noted in the Offer Letter, that is, a $300,000 annual salary, a bonus as provided in the Bonus Plan, and (per the amendment contained in the Advance Letter) reasonable moving expenses.  Defendant contends it paid what the Offer Letter required (and they appear to assert that they owe nothing under the Advance Letter because any potential obligation is offset by the $60,000 kept by Plaintiff), and therefore that the facts cannot support Plaintiff's breach of contract claim.

Plaintiff counters that the Offer Letter is not fully integrated and therefore that parol evidence may be considered in determining the precise terms of his employment.  Plaintiff further contends that the record evidence indicates that there is a genuine dispute of fact as to whether he was guaranteed a bonus of at least 75% of his salary in 2018, and whether his 2018 bonus should have been calculated using Defendant's overall performance, and not just the performance of the European division.  Plaintiff also argues that genuine issues of fact exist as to whether his claimed expenses were reasonable.[11]

---

[10] To the extent Plaintiff intends to recover either a success fee or a change-in-control benefit, the court finds that such a claim cannot be stated, since it is undisputed that Defendant has not been sold, and thus the predicate condition for such remuneration has not been met.

[11] Defendant argues in its reply brief that Plaintiff has abandoned his breach of contract claim, both as to his 2019 bonus, and as to his claimed expenses.  The court disagrees with the latter.  While Plaintiff (in his opposition brief) raises arguments as to his expenses in a section other than the one related to the alleged breach of contract, the court considers the expense arguments in the context of that claim, as well.   However, the court agrees that any breach of contract claim was abandoned insofar as it relates to a 2019 bonus, though it is not clear that Plaintiff ever claimed any entitlement to a bonus for 2019. Whether abandoned or never raised, the court finds that there is no claim for a 2019 bonus.

### 1.   __Integration__

Accordingly, the preliminary issue to be resolved is whether the Offer Letter represents the full and complete employment agreement such that its stated terms, and only its stated terms, governed Plaintiff's employment.  The court finds the Offer Letter does not represent the full and complete terms of the employment agreement.

Within contract law, "integration" refers to a "final expression of one or more terms of an agreement . . . ."  *Associated Catalog Merchandisers, Inc. v. Chagnon*, 210 Conn. 734, 740 (1989); *see also Tallmadge Bros., Inc. v. Iroquois Gas Transmission System, L.P.,* 252 Conn. 479, 503 (2000) (noting that in order for a writing to be integrated, the parties must have intended it to contain their entire agreement).  Under Connecticut law, the intent of the parties is determinative of whether a written contract is integrated, and this determination is a question of fact for the court.  *Id.* at 739–40 "The most common method of creating a fully integrated agreement is through a merger clause," *Matteson v. Safeco Ins. Co. of Illinois*, 593 F. Supp. 3d 5, 22 (D. Conn. 2022), and where the parties have included a merger clause in the contract, that clause is "conclusive proof of the parties' intent to create a completely integrated contract . . . ."  *Benvenuti Oil Co. v. Foss Consultants, Inc.*, 64 Conn. App. 723, 728 (2001).  Where a contract is integrated, courts will not consider extrinsic evidence in construing it.  *Id.*

"However, the mere absence of a merger clause does not necessarily mean that a written contract is not fully integrated."  *Matteson*, 593 F. Supp. 3d at 22.  Even without a merger clause, a contract may yet be integrated.  "As with any question of contractual interpretation, our initial guide must be the actual words used in the contract."  *Tallmadge Bros.,* 252 Conn. at 498–99.  "Where the language of the contract is clear and

17

unambiguous, the contract is to be given effect according to its terms." *Id.* at 498 (citations omitted). Contract ambiguity, however, justifies the consideration of parol evidence. *Jay Realty, Inc. v. Ahearn Development Corporation*, 189 Conn. 52, 56 (1983). Thus, the court[12] may look to extrinsic evidence in determining whether the parties intended the contract to be integrated. *Associated Catalog*, 64 Conn. App. at 740. This evidence should include "the conduct and language of the parties and the surrounding circumstances." *Id.* at 739.

Neither party suggests that a merger clause is contained in either the Offer Letter or the Cover Letter. However, Defendant argues that extrinsic evidence nevertheless shows that the Offer Letter and Cover Letter are one, integrated employment agreement. Specifically, Defendant points to the fact that the Cover Letter says that the Offer Letter "contains the terms we [Plaintiff and Langevin] discussed." ECF No. 138-22. Further, the Cover Letter acknowledges Plaintiff's desire for a success fee and for change-of-control protection, but it notes that neither one is included in the Offer Letter (and while it declines to commit to providing either one, it suggests that each possibly could be considered at some future time). *Id.* Defendant also points to an email between Mr. Langevin and Plaintiff in which Langevin specifically noted that he "took out the guarantee on the bonus" from the Offer Letter. ECF No. 138-23.

Plaintiff asserts that Defendant cannot use the Cover Letter, a "collateral document", ECF 151 at 5, to show that the Offer Letter was integrated because

---

[12] This question of fact (whether a contract is integrated) remains one for *the court* to determine. Plaintiff argues that absent a merger clause, this question of fact should not be determined at summary judgment, but the Supreme Court of Connecticut has rendered clear judgment on this point: "Whether the parties intended to integrate their negotiations in a writing is a question of fact *for the court*." *Associated Catalog*, 210 Conn. at 740 (emphasis added).

integration, itself, would preclude review of the Cover Letter.  That argument is unavailing. As previously discussed, where a contract contains no merger clause, Connecticut law holds that a review of extrinsic evidence may reveal that the parties intended their written contract to be integrated.  *Matteson*, 593 F. Supp. 3d at 22 (D. Conn. 2022).  And a thorough review of the record (to include collateral evidence beyond the Offer Letter) causes the court to determine that the parties *did not* intend the Offer Letter, alone, to represent the full and final terms of Plaintiff's employment.

The Offer Letter clearly does not include either Plaintiff's requested success fee ("opportunity to participate" upon sale of the company), or his requested change-in-control benefit.  ECF No. 138-22 at 3.  And the Cover Letter explains that Defendant explicitly declined to include those benefits in the Offer Letter, purposefully leaving them open for discussion at "an appropriate juncture" or "an appropriate time."  ECF No. 138-22 at 2. So, as to these benefits, the Offer Letter's plain language makes no mention of their inclusion in the employment agreement, and the *Cover* Letter's language makes it clear the omission was intentional.  And a "not now" or a "maybe later" seems to be more of a "no, absent reconsideration," or perhaps a "no, until further notice."  *See Med. Device Sols., LLC v. Aferzon*, 207 Conn. App. 707, 731 cert. denied, 340 Conn. 911 (2021) (finding that where an agreement stated that "[a]ny development, funding or financial commitments required will be part of a separate agreement and negotiated at a later date," that the agreement was integrated as to that term).  So, on their face, these omissions from the offer appear intentional and unambiguous, and they seem to show the Offer Letter to be fully integrated insofar as the Cover Letter is concerned.  Because the Cover Letter explains that the two benefits were considered but were declined by

Defendant, such that they purposely were left out of the Offer Letter, it might help show that the parties intended the Offer Letter to be integrated as to the two benefits.  But without a merger clause, review of additional extrinsic evidence is permissible, and it causes the court to determine that the Offer Letter is not a fully-integrated document; there are additional employment terms, and extrinsic evidence exposes their ambiguity. Specifically, certain emails between Mr. Langevin and Plaintiff undermine Defendant's position, particularly regarding the *bonus guarantee*.  An email from Plaintiff sent on August 14, 2018, asks Mr. Langevin to "please include [that] the minimum bonus for 2018 shall be 75% of the target annual bonus", ECF No. 138-25 at 2, but this bonus guarantee did *not* make its way into the Offer Letter, *see* ECF No. 138-22; ECF No. 138-23 at 2. Two days later, Plaintiff reviewed a draft of the Offer Letter sent by Mr. Langevin, and responded that certain terms "must have been overlooked . . . ."  ECF No. 138-23 at 2. Plaintiff's comment on the omission of the bonus guarantee suggests that he intended it to be part of the agreement.  *See Matteson*, 593 F. Supp. 3d at 22 (finding confusion expressed by a party's lawyer over certain contract terms to be a sign that at least one party did not intend the agreement to be fully integrated).  And while he could have sought additional clarity of the offer's terms,[13] or he could have demanded inclusion of the bonus guarantee in the Offer Letter, additional extrinsic evidence shows why he did not do so.

Mr. Langevin responded to Plaintiff on this point via another August 16 email clearly noting that, indeed, Mr. Langevin "took out the guarantee on the bonus" (removing

---

[13] Additionally, Mr. Langevin explained that the bonus guarantee was removed from the Offer Letter "because I believe we are very close to the full pay out and I do not want to upset our current guys, especially Steve."  ECF No. 138-23 at 2.  The record does not suggest that Plaintiff sought or needed clarity regarding what it meant to be "close to the full pay out," nor whether the guarantee was still a term of the agreement (just without being visible to "Steve").

it from the Offer Letter accepted by Plaintiff).  ECF No. 138-23 at 2.  Defendant cites to this email as further support for its position that the Offer Letter was fully-integrated, and Langevin noting, "I took out the guarantee on the bonus" may appear to be a clear disavowal of the obligation.  As such, if this analysis ended with review of these email excerpts together with the Offer Letter, one might conclude that the parties intended the Offer Letter to serve as an integrated document showing that the bonus guarantee was not a part of the employment agreement between the parties. But the analysis does not end there, and additional context causes the court to find otherwise.

First, review of the complete August 16 email shows that Mr. Langevin stated to Plaintiff that the reason he omitted the bonus guarantee was because he believed they were "very close to the full pay out" anyway, and he did not want to upset any of the other executives.  ECF No. 138-23.  This does not indicate that the bonus guarantee was no longer being offered, but that it was no longer explicitly stated.

Furthermore, on August 17, 2018, Mr. Langevin forwarded an email to Plaintiff attaching what apparently was intended to be a final draft of the Offer Letter; the  email also included text from an email exchange between Mr. Langevin and General Counsel Marvin Rosenberg.  In that exchange, Mr. Langevin explained to Attorney Rosenberg that Plaintiff wanted the Offer Letter to explicitly contain details of the bonus guarantee.  *See* ECF No. 138-24 at 2.  Mr. Langevin explained that he had "suggested [the letter should] say something like we assume [Plaintiff is] going to make 100% of the bonus plan for 2018, but, we will agree to have [the bonus] not less [than] 75% for this first year due to overseas assignment.  This way when Steve [another executive] sees this letter he can be challenged to get 100%."  *Id.*  Mr. Langevin's suggestion makes clear that the bonus

21

guarantee was not out of consideration, and it hints that at least he and Plaintiff believed it to be an element of the agreement.  Moreover, Plaintiff clearly saw that Mr. Langevin suggested to Attorney Rosenberg that the bonus guarantee be explicit in the Offer Letter (and he saw this **after** Mr. Langevin's August 16 email to Parimal in which Mr. Langevin explained to Parimal why he had removed the bonus guarantee from the Offer Letter).  *See* ECF No. 138-23 at 2.  Further still, nothing in the shared emails showed Attorney Rosenberg rejecting the suggestion of a guaranteed bonus.  Thus, review of all the extrinsic evidence (including the email exchange between Mr. Langevin and Attorney Rosenberg), simultaneously with the explicit terms of the Offer Letter, indicates that the parties did *not* intend the Offer Letter to serve as a fully-integrated document that properly expressed the parties' agreement, particularly as to the 75% bonus guarantee.  One would expect the complete revocation of an apparently agreed-upon term to be done explicitly, rather than by forwarding emails suggesting that the term remains intact (despite being removed from the written terms expressed in the offer).

Moreover, it is clear that the Offer Letter did not contain all the material terms of Plaintiff's employment.  The first paragraph establishes that Plaintiff was to be responsible for overseeing the Italian Subsidiary, and the second paragraph begins with an unambiguous statement of Plaintiff's base salary.  ECF No. 138-22 at 3.  However, even whereas the Offer Letter notes that Parimal's starting salary would account for his "initial [full-time] assignment in Italy", *id.*, it says nothing of the housing expenses that apparently would be covered by Defendant under the parties' agreement.  In fact, Plaintiff emailed Mr. Langevin about that very topic, wondering, "Should we include that expenses in Italy including Housing (apartment rental) will be covered?   Not necessary because it is

understood anyway."  ECF No. 138-25 at 2.  The record (to include the Cover Letter) bears no indication that Defendant refuted this characterization, and the Offer Letter fails to note any housing allotment in addition to the stated salary, though this reasonably could be deemed a material term of employment one would expect to be included in a complete employment agreement.  Thus, the parties' otherwise unwritten "understanding" that housing expenses would be covered by Defendant is further indication of the fact that the Offer Letter was not itself a fully-integrated employment contract as to this point.

Accordingly, the court concludes that the Offer Letter was not fully integrated because it does not appear that the parties intended it to serve as a final expression containing all material elements of their entire employment agreement.

### 2.  Parol Evidence

Parol evidence is evidence outside the four corners of a contract that is relevant to terms within the contract.  *HLO Land Ownership Assocs. Ltd. P'ship v. City of Hartford*, 248 Conn. 350, 358 (1999).  The parol evidence rule is a rule of substantive contract law that states that where the parties to a contract have deliberately reduced their entire agreement to an integrated writing, then extrinsic evidence may not be used to vary or contradict the terms of that writing.  *Alstom Power, Inc. v. Balcke-Durr, Inc.*, 269 Conn. 599, 609 (2004).  The court having found that the Offer Letter was not an integrated contract, however, there is no bar to reviewing parol evidence here. *Benvenuti Oil Co.,* 64 Conn. App. at 728 ("The parol evidence rule does not apply, however, if the written contract is not completely integrated.").

The same evidence which leads the court to conclude that the Offer Letter and the Cover Letter were not a fully-integrated contract also leads the court to conclude that

there are genuine issues of disputed fact that preclude the entry of summary judgment on this claim.  It is clear that there was discussion between Langevin and Plaintiff that Plaintiff's bonus in 2018 would be guaranteed at 75% of his salary.  It is also clear that there was no explicit revocation of that alleged guarantee in any of the email correspondence provided to the court.  And, as discussed *supra*, Mr. Langevin conceded to Attorney Rosenberg that Langevin suggested that the Offer Letter should include a guarantee of no less than a 75% bonus.  Taken together, this evidence could cause a reasonable jury to find that a 75% bonus guarantee was part of the agreement contemplated by the parties.  *See, e.g., Matteson*, 593 F. Supp. 3d at 23.  That is to say, a jury reasonably could find that the defense agreed that a 75% bonus should be guaranteed, but that the defense had concerns over how another executive ("Steve") might perceive the guarantee's impact on that executive's own bonus prospects, such that the bonus guarantee *only* was omitted from the Offer Letter for reasons of optics, while the parties themselves still understood that Plaintiff could be comfortable in knowing that he would earn a bonus in an amount equal to at least 75% of his salary.  A jury also reasonably could determine that the absence of a bonus guarantee means that it was not a term of the parties' agreement, but the court is obligated to make all reasonable inferences in *Plaintiff's* favor at this juncture.

Further, it appears that while the Offer Letter contemplated a reduction in Plaintiff's salary after he was no longer living in Italy, he understood that his salary would not be so reduced, and in fact there was no reduction.  Therefore, it appears that the explicit terms of the Offer Letter were not necessarily the terms that governed Plaintiff's employment, and this supports Plaintiff's version of events.  Furthermore, Langevin's deposition

testimony does not show that he has clear and confident recollection of his negotiations with Plaintiff.  From this evidence, a jury reasonably could infer that the terms of Plaintiff's employment included a guaranteed bonus in his first year.

It is also clear from the record that a jury reasonably could infer that Plaintiff's bonus was to be calculated based on Defendant's overall performance, and not only on the performance of the European division.  Mr. Langevin's deposition testimony is unclear on that point, too, whereas Plaintiff's testimony indicates a clear recollection of the parties' verbal agreement on this point.  And in an email to Plaintiff, Mr. Langevin stated that he believed Plaintiff would be entitled to his full bonus, because they were "very close" to the requisite performance targets.  This indicates that he believed Plaintiff's bonus to be based upon the company's overall performance, given that the Italian Subsidiary was apparently nowhere near achieving the requisite performance thresholds for Plaintiff to receive his full bonus based on the European group's financial position.

Finally, the court finds that whether Defendant breached the Advance Letter by declining to repay all Plaintiff's reported expenses presents a question of fact for a jury to decide.  Particularly considering that Attorney Rosenberg himself reviewed the expense report and found that all of the expenses claimed by Plaintiff appeared to be appropriate, a reasonable jury could find for Plaintiff on this point as well.

Consequently, the court finds that Defendant's summary judgment motion must be denied with respect to Plaintiff's claim for breach of contract, except insofar as Plaintiff intends to state the claim in relation to his 2019 bonus.

**B.    Promissory Estoppel**

For years, Connecticut courts have recognized promissory estoppel claims.  That doctrine holds that a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."  *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 104 (2003) (quoting *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 213 (1987)).  A fundamental element of a promissory estoppel claim is "the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance."  *Id.*

Plaintiff asserts a promissory estoppel claim against Defendant, alleging that, to his detriment, he reasonably relied upon Defendant's promises regarding the terms of his employment (his bonus, his success fee, and his change-of-control benefit).   More specifically, he alleges that he gave up a lucrative opportunity with Terex to work with Defendant because he thought Defendant presented an opportunity for stable, long-term employment, and that he made significant outlays in uprooting his life and his family's life and moving to Texas.  Defendant argues that it made none of these alleged promises in the first instance, but moreover that these promises were not included in the Offer Letter and therefore that Plaintiff's alleged reliance upon them was not reasonable.  Defendant further argues that this claim must be dismissed because Plaintiff cannot show any injury stemming from his acceptance of the position with Defendant, since there has been no sale of the company and so no event has occurred that would trigger either a success fee

or a change-in-control benefit, and Plaintiff had no offer from Terex, so he missed no opportunity there.  Plaintiff responds that these are all questions of fact for a jury to decide.

The court partially agrees with each party.  With respect to the success fee and the change-of-control benefit, it is clear from the Cover Letter that while Defendant was open to continued negotiation on those points, it did not promise them.  "[T]he promise must reflect a present intent to commit as distinguished from a mere statement of intent to contract in the future."  *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 105 (2003).  And unlike for the bonus, there is also no additional record evidence that indicates that Langevin at any point made a more definitive assurance with respect to those two items.  Accordingly, it is clear from the undisputed evidence that there is no indication of a *present intent* to commit to the success fee and change-in-control benefit, although Defendant expressed a willingness to continue discussing such things.  As such, Plaintiff cannot show that he reasonably relied upon those alleged promises, and Defendant's MSJ must be granted insofar as the success fee and change-in-control benefit provide the underlying basis for this claim.[14]

However, for the same reasons noted in the previous section, the court finds that there is a genuine issue of disputed fact regarding the bonus.  Given that the Offer Letter was not integrated, that there clearly was discussion of a guaranteed bonus, that Mr. Langevin wrote that he was removing the guarantee from the Offer Letter for no reason other than that he was concerned for the optics of such a guarantee, and that he was confident the performance metrics would lead to Plaintiff receiving his full target bonus anyway, the court concludes that Plaintiff has adduced sufficient evidence from which a

---

[14] Given this conclusion, the court need not address Defendant's argument regarding the Statute of Frauds.

reasonable juror could conclude that a promise of a guaranteed bonus was made, that Plaintiff reasonably relied upon that promise in accepting the position with Defendant, and that Plaintiff was injured because he was not given the alleged bonus and because of his move to Texas.  However, the court finds insufficient evidence in the record to support any claim that Plaintiff lost a potentially lucrative consulting opportunity with Terex when he accepted Defendant's offer of employment.  Although Plaintiff asserts that he declined the Terex opportunity, it appears that at best he ceased pursuing a potential opportunity with Terex, not that he declined a certain offer.  The Terex CEO affied that there was never an offer presented to Plaintiff, and Plaintiff's own deposition testimony shows that Plaintiff informed the Terex CEO of his chance to work with Defendant, and was encouraged by the CEO to accept Defendant's offer.  Even construing the evidence in the light most favorable to Plaintiff, the court cannot find that his reliance on Defendant's alleged promises resulted in any potential loss of work with Terex.

Defendant's summary judgment motion therefore is denied with respect to the promissory estoppel claim, insofar as it relates to the alleged guaranteed bonus for 2018.

### C.    Breach of Implied Covenant of Good Faith and Fair Dealing

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 598 (1996) (quoting *Habetz v. Condon*, 224 Conn. 231, 238 (1992)).  There are three elements to a claim for breach of the implied covenant: "(1) two parties must engage in a contract [from] which the plaintiff reasonably expects to benefit; (2) the benefit is in some way injured by the other party's actions; and (3) these injurious actions were the product of the defendant's

28

bad faith."  *Owen v. Georgia-Pac. Corp.*, 389 F. Supp. 2d 382, 393 (D. Conn. 2005).  "Bad faith means more than mere negligence; it involves a dishonest purpose."  *Habetz*, 224 Conn. at 237.

Plaintiff accuses Defendant of breaching this implied covenant by engaging in deceptive conduct.  Defendant argues that it is entitled to summary judgment on this claim because Plaintiff cannot establish any of the elements of such a claim.  Defendant asserts that it has honored all the terms of the employment agreement (the Offer Letter), that Plaintiff could not reasonably expect any benefits in addition to those expressed therein, and that there is no evidence that Defendant withheld any benefit in bad faith.  Plaintiff again responds that each of these elements is a question of fact that a jury should decide.

Consistent with the court's prior conclusions, Defendant's arguments are unavailing insofar as they rely on the premise that the Offer Letter represented the complete, final terms of Plaintiff's employment, or that there is no genuine dispute as to the complete, final terms of Plaintiff's employment when parol evidence is considered. The court already has found that there is a genuine dispute of fact as to whether Mr. Langevin promised Plaintiff a guaranteed bonus, whether that bonus was to be calculated upon Defendant's overall performance, and whether Plaintiff's business and relocation expenses unjustifiably were denied.  It is undisputed that Plaintiff did not receive a bonus equal to 75% of his salary and that he was not reimbursed for all his reported expenses. Moreover, the court finds that a reasonable jury, crediting Plaintiff's version of events, could find Plaintiff's reliance upon Mr. Langevin's alleged promises to be reasonable, particularly since Plaintiff and Mr. Langevin had known one another (professionally) for some time, and particularly given the alleged reasons for the omission of the contested

employment terms.  Therefore, the court finds that a reasonable juror could find that the first two elements of the claim are satisfied.

The court further finds that there is sufficient evidence in the record from which a reasonable juror, crediting Plaintiff's version of events, could find bad faith.  First, Plaintiff has asserted that his termination was a consequence of his pointing out certain illegal accounting practices.  Second, the reason for the reduced bonus was not relayed to Plaintiff until after his termination, from which a juror reasonably could infer that the explanation was created post hoc.  And third, should a juror determine that the parties intended Plaintiff's bonus to be based on Defendant's overall performance, but that Defendant later unilaterally reinterpreted the contract to completely eliminate Plaintiff's bonus entitlement, that determination could lead to the reasonable inference that such reinterpretation was the result of some dishonest purpose.

Accordingly, Defendant's summary judgment motion is denied as to Plaintiff's claim of breach of the implied covenant of good faith and fair dealing.

### D.    Fraudulent Misrepresentation/Negligent Representations

Defendant addresses both of Plaintiff's fraud claims together, and so the court will do the same.  The Supreme Court of Connecticut describes viable claims of negligent misrepresentation in this way, citing the Restatement (Second) of Torts:

> One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Kramer v. Petisi*, 285 Conn. 674, 681 (2008) (quoting *Williams Ford, Inc. v. Hartford Courant Co.* 232 Conn. 559, 575 (1995)) (alteration in original).  Even an accidental

misrepresentation of fact may be actionable under this doctrine.  *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 144 (2010).   "Although the general rule is that a misrepresentation must relate to an existing or past fact, there are exceptions to this rule, one of which is that a promise to do an act in the future, when coupled with a present intent not to fulfill the promise, is a false representation."  *Brown v. Otake*, 164 Conn. App. 686, 706 (Conn. App. Ct. 2016) (quoting *Paiva v. Vanech Heights Construction Co.*, 159 Conn. 512, 515 (1970)).

"In contrast to a negligent  representation, [a] fraudulent representation . . . is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it."  *Sturm*, 298 Conn. at 142 (quoting *Kramer*, 285 Conn. at 684 n. 9) (alterations in original).  The elements of a fraudulent misrepresentation claim are "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury."  *Id.* (quoting *Suffield Development Associates Ltd. Partnership v. National Loan Investors, L.P.*, 260 Conn. 766, 777–78 (2002)).

Defendant asserts that, for both claims, Plaintiff has failed to show a misrepresentation or reliance.  More specifically, Defendant asserts that it never promised Plaintiff a guaranteed bonus, a success fee, or a change-in-control benefit, and that it was not reasonable for Plaintiff to have relied upon any alleged misrepresentation because Parimal was an at-will employee.  Defendant further asserts that with respect to the fraudulent misrepresentation claim, Plaintiff has failed to show any intent to induce reliance.  Plaintiff argues that Defendant's arguments only can prevail if the court accepts

reasonable inferences in the *movant's* favor, which is contrary to the applicable legal standard for granting summary judgment.

Plaintiff's point is well-taken.  At this point, with respect to this claim, the court is obligated to draw all reasonable inferences in *Plaintiff's* favor, not Defendant's.  As has been discussed already, the court finds that there is sufficient evidence from which a jury could find that Plaintiff was promised a guaranteed bonus, which in itself can qualify as a misrepresentation, and furthermore there is evidence from which a jury reasonably could find that Mr. Langevin's representation regarding the likelihood of a full bonus payout (and relatedly, whether he indicated that Plaintiff's bonus would be based on company-wide performance) also was misleading.  Given this representation's distance from the truth, a reasonable jury also could find that the statement was made in bad faith.  And although Defendant attempts to cabin Plaintiff's deposition testimony to show that his only basis for accepting employment with Defendant was his desire to secure a long-term professional situation, which desire was unreasonable given Plaintiff's at-will status, common sense demands the conclusion that Plaintiff's compensation, including the bonus, was part of the inducement to take Defendant's offer of employment.  Thus, the court finds that Plaintiff has adduced sufficient facts to carry his negligent misrepresentation claim past summary judgment.

The court further finds that there is sufficient evidence from which a reasonable jury could infer that Defendant intended to induce Plaintiff's reliance upon his representations regarding the bonus amount.  Langevin himself gave deposition testimony that he was trying to craft the bonus term to please both Plaintiff and the current executive team.  *See* ECF No. 152-2 at 5–6.  This testimony, coupled with his email

statement that he believed Plaintiff should receive a full payout based on performance metrics anyway, could lead a juror reasonably to infer that Mr. Langevin misrepresented Plaintiff's bonus compensation in order to induce Plaintiff to accept the employment offer.

However, consistent with its conclusions, *supra*, the court agrees with Defendant that Plaintiff has failed to state these claims insofar as they are predicated upon the promise of a success fee and a change-in-control benefit, and to the extent Plaintiff claims any injury stemming from his allegedly declining an opportunity with Terex. As previously discussed, even viewing the evidence in a light most favorable to Plaintiff, there is no evidence that Plaintiff had a concrete offer from Terex, so his injury in accepting Defendant's offer is limited to the purported reduction in compensation from Defendant.

Accordingly, Defendant's motion is granted in part with respect to these two claims.

### E.   Wrongful Termination

Plaintiff's final claim against Defendant is one for wrongful termination. He asserts that he was terminated for bringing attention to the improper accounting procedures employed by the Italian Subsidiary. Defendant argues that Plaintiff was employed at-will and therefore could be terminated for any reason or for no reason at all.

The parties disagree whether Texas or Connecticut law governs this claim. Although each state's law generally provides that at-will employees may be terminated for any reason or for no reason at all, Texas has but one narrow exception to this general provision: an at-will employee still may state a claim for wrongful termination if they are terminated for refusing to perform an illegal act. *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 659 (Tex. 2012), as corrected (June 8, 2012). Connecticut common law, however, will allow a wrongful termination claim to proceed where an individual's termination

violates public policy, and Plaintiff characterizes himself as an internal whistleblower whose termination implicates public policy. *Thibodeau v. Design Grp. One Architects, LLC,* 260 Conn. 691, 694 (2002); *see Trusz v. UBS Realty Inv'rs*, No. CIV3:09CV268JBA, 2010 WL 1287148, at *9 (D. Conn. Mar. 30, 2010) ("When employees speak out about potentially illegal activities of their employers that affect third parties or the community at large, courts have held that public concerns are implicated."). Defendant argues that Texas had the most significant relationship to the termination and therefore Texas law should govern. Plaintiff argues that Connecticut courts decline to enforce another state's laws where that law is contrary to public policy, and so Texas law should not govern here, where Plaintiff was terminated for whistleblowing.

The court does not find the choice of law to be outcome determinative. Although Plaintiff asserts that he was terminated for being an internal whistleblower, the record indicates that he did not refuse to continue carrying out the allegedly-improper accounting practices. He simply wanted explicit instructions to do so. Plaintiff's own affidavit states that he would have phased out the practice if the CFO had given him written instructions to that effect. ECF No. 152-1 ¶ 35. Also, there is no indication that his request for written instructions was related to any desire to publish the alleged activity to any governmental authority. Rather, it appears Plaintiff simply was seeking to avoid liability for the activity should it be discovered. Thus, he was not declining to engage in illegal activity, and he was not an internal whistleblower whose termination might implicate public policy. Ergo, under either state's law, Plaintiff could not state a claim for wrongful termination.

Accordingly, Defendant's summary judgment motion is granted with respect to the wrongful termination claim.

### F.      Breach of Contract: Repayment of Brokerage Fees

Defendant asserted a counterclaim for breach of contract against Plaintiff for failure to repay the $60,000 that, per the Advance Letter, was to be paid in connection with brokerage fees associated with the sale of Plaintiff's house in Connecticut.  Defendant asserts that it is undisputed that Plaintiff has not returned this money, and therefore Defendant is entitled to summary judgment on this claim.  Defendant further asserts that it is entitled to a setoff for any unpaid expenses to which Plaintiff may be entitled.[15] Plaintiff responds that there are genuine disputes as to the sale of Plaintiff's house in Connecticut and the amount that Defendant still owes Plaintiff in expenses.

As stated, *supra*, "[t]he elements of a breach of contract action are 'the formation of an agreement, performance by one party, breach of the agreement by the other party[,] and damages.'" *Rosato*, 82 Conn. App. at 411 (quoting *Bouchard* 80 Conn. App. at 189). With respect to these elements, the court finds there is no genuine dispute of fact that each is satisfied, and indeed, it does not appear that Plaintiff disputes that he owes Defendant the $60,000.  However, the court finds that there is a genuine dispute of fact as to whether Defendant improperly denied certain relocation expenses in Plaintiff's expense report for February and March of 2019.  There is record evidence that Attorney Rosenberg reviewed the expense report, compared it with the expenses allowed in the Advance Letter, and found all Plaintiff's claimed expenses to be appropriate.

---

[15] Defendant asserts that Plaintiff fails to respond to its argument for setoff, and therefore that the court simply may award Defendant the $60,000 it alleges it is owed, but the court finds this is too narrow a reading of Plaintiff's brief in opposition to Defendant's MSJ.  Although Plaintiff fails to state, in so many words, that he is entitled to a setoff, he does argue that there are genuine disputes as to whether Plaintiff is entitled to reimbursement of those expenses that Defendant denied.  The court construes this to address Defendant's argument regarding a setoff.

Therefore, Defendant's summary judgment motion is granted with respect to this claim, but its recovery is subject to a setoff of any expenses Defendant agrees are reimbursable, plus any additional expenses a jury finds were improperly rejected.

### G.      Breach of Fiduciary Duty

Defendant also asserts that Plaintiff breached his fiduciary duties when he drafted a term sheet on behalf of Competitor for the Demag business.  Each party asserts it is entitled to summary judgment on this claim.

Here, again, the court first must determine the appropriate law to govern the claim. Defendant is incorporated in Michigan, so Defendant argues that under the internal affairs doctrine, Michigan law should govern this claim.  Plaintiff responds that no choice-of-law inquiry is necessary because under either Connecticut or Michigan law, whether any of Plaintiff's actions was a breach of his fiduciary duties is a question for the jury.[16]

The court agrees that no choice-of-law inquiry is necessary, but not for the reason Plaintiff asserts.  Whether or not any of Plaintiff's actions could qualify as breaching a fiduciary duty to Defendant, both Connecticut and Michigan law require a showing of damages or injury in order for a breach of fiduciary duty claim to lie.  *See Censor v. ASC Techs. of Connecticut, LLC*, 900 F. Supp. 2d 181, 213 (D. Conn. 2012) (stating that the elements of a breach of fiduciary duty claim under Connecticut law are that there exists a fiduciary relationship that gives rise to certain duties and obligations, that the fiduciary advanced their own interests to the detriment of the party to whom they owed such duties and obligations, and that that party suffered damages proximately caused by the

---

[16] Plaintiff also argues that the only bases for this counterclaim are unsubstantiated hearsay statements, but clearly that is untrue; Plaintiff himself admitted to drafting the term sheet as part of an investment opportunity for himself and Competitor.

fiduciary's breach of their duties); *Nicholson-Gracia v. Gen. Ret. Sys. of Detroit*, No. 334556, 2018 WL 987212, at *2 (Mich. Ct. App. Feb. 20, 2018) ("The elements of a fiduciary duty claim are (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) proximately causing damages.").[17]  But there is no evidence of any injury to Defendant here.  There is no allegation of even a potential injury to Defendant, as Defendant had no interest is purchasing Demag, and Mr. Langevin testified that Defendant's interests are wholly separate from Tadano's.  ECF No. 138-19 at 13 ("[Defendant] get[s] no benefit from [Tadano's or Terex's] activities outside of [Defendant].").  In fact, Mr. Langevin testified that he did not want Tadano to purchase Demag because the acquisition was likely to pull Tadano's attention away from Defendant.  ECF No. 138-19 at 12.  Also, there is no allegation that Plaintiff owed any fiduciary duties to Tadano, and even if there were such an obligation, it is undisputed that Tadano in fact did purchase Demag.  Even if Competitor had purchased Demag, the record evidence indicates that Competitor was a back-up option for Terex, so presumably Competitor's acquisition only would have occurred if Tadano had decided not to purchase Demag.  Viewing the evidence in a light most favorable to Defendant, the record shows that the total of Plaintiff's efforts regarding Competitor culminated in a few emails, a few telephone discussions, and the drafting of a half-page draft term sheet.  Even if Plaintiff did use the laptop Manitex provided him to draft the term sheet, the court cannot find that these de minimus resources that Plaintiff

---

[17] Both parties assert that *Nicholson* states that claims for breach of fiduciary duty do not require a showing of damages, but both parties misread *Nicholson*, which actually reiterates the long-held elements of a breach of fiduciary duty claim, including the damages element, and which even affirms the lower court's dismissal of a breach of fiduciary duty claim *because the plaintiff failed to plead any damages.* 2018 WL 987212 at 2 ("Without adequately pleaded damages, the circuit court properly dismissed [the breach of fiduciary duty claim].").  The parties apparently confused the damages element of the claim with the injury element for establishing standing (which the court noted need not be "concrete and particularized.").  *Id.* at *1.

devoted to this endeavor could have distracted him from performing his duties to Defendant.  And again, and more importantly, none of those efforts resulted in Competitor purchasing Demag, or even in interference with Tadano's acquisition of Demag.

Defendant's argument appears to be that its damages include the compensation paid to Plaintiff while he was allegedly breaching his duties to Defendant.  But the court disagrees with Defendant's position that case law is "clear" that disgorging an employee's compensation is an appropriate remedy in cases such as this one.  Defendant points to a single case, *Nedschroef Detroit Corp. v. Bemas Enterprises LLC*, 106 F. Supp. 3d 874 (E.D. Mich. 2015), aff'd, 646 F. App'x 418 (6th Cir. 2016), in which a federal court awarded several employees' past compensation as damages to an employer where those employees had engaged in disloyal activity, but the facts in that case were very different than those presented here.  In *Nedschroef,* two employees formed a company and began competing directly with their employer, using their employer's equipment, personnel, and trade secrets.[18]  In a case more similar to the one at bar, where there has been no financial loss to the employer, the same federal district court declined to award an employee's compensation as damages.  *See Blankenship v. Superior Controls, Inc.*, 135 F. Supp. 3d 608, 627–28 (E.D. Mich. 2015) (declining to award the employee's compensation as damages, and granting summary judgment to the employee because the employer failed to show injury).

Therefore, what is clear to this court is that there still must be some injury before a party is entitled to disgorge an employee's compensation.  Such injury is absent here,

---

[18] The court notes, too, that it is not entirely clear whether the disgorgement of the employees' compensation in *Nedschroef* was the remedy for the breach of fiduciary duty, or for one of the myriad other claims the employer asserted against its employees.

as stated, *supra*.  There is no indication that Defendant suffered any repercussion from Plaintiff's alleged misconduct; Defendant was not interested in purchasing Demag, and did not even know about Competitor until after this case had been initiated, and only then because a Terex employee mentioned it to Mr. Langevin.  ECF No. 133-1 at 9–10.  Also, there is no evidence that Plaintiff improperly used Defendant's trade secrets.  Thus, even if Michigan law applies, and even if disgorgement of an employee's wages is proper under Michigan law, this is not the sort of case where such action would be warranted.

Finally, the court must address Defendant's argument that Plaintiff violated the employee handbook by engaging in the conduct at issue without informing anyone at Manitex.  That may be so.  But the employee handbook is no authority for determining what constitutes a cognizable claim for a breach of a fiduciary duty in a court of law.

Accordingly, Plaintiff's summary judgment motion is granted with respect to the claim for breach of fiduciary duty.

## H.    Laptop Claims

Finally, the court turns to Defendant's two asserted counterclaims based on Plaintiff's failure to return the laptop.  First, Defendant asserts that Plaintiff violated the Texas Theft Liability Act ("TTLA"), and second, that he committed conversion by retaining the laptop.  Each party contends that it is entitled to summary judgment on each claim.

It is undisputed that in order to carry its TTLA claim, Defendant must show that it had a possessory right to the laptop; that Plaintiff unlawfully appropriated the laptop in violation of Texas's Penal Code; and that Defendant sustained damages as a result. *Domain Prot., LLC v. Sea Wasp, LLC*, 426 F.Supp.3d 355, 382-83 (E.D. Tex. 2019).

Defendant also must establish that Plaintiff intended to unlawfully take the laptop. *Id.; see also* Tex. Penal Code Ann. § 31.03.

The conversion claim, however, raises a preliminary choice-of-law question. Plaintiff asserts that the claim is governed by Connecticut law, while Defendant contends that the claim is governed by Texas law.  In applying the requisite factors under the "significant relationship" test, the court finds that Plaintiff was living and working in Texas at the time of his termination and at the time Defendant requested the return of the laptop; that although Defendant is incorporated in Michigan, all the actions relevant to this claim occurred in Texas (or near Defendant's operations therein); and that Plaintiff is still living in Texas, where he continues to retain the laptop.  Therefore, although Plaintiff's contract negotiations took place while he lived in Connecticut, and although he was given the laptop while he lived here, the court concludes that the place where Plaintiff was terminated and where he refused to return the laptop has the most significant relationship with this claim, and therefore that Texas law governs.  And under Texas law, the elements of a conversion claim are that "(1) the [claimant] owned or had possession of the property or entitlement to possession; (2) the [opposing party] unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the [claimant's] rights as an owner; (3) the [claimant] demanded return of the property; and (4) the [opposing party] refused to return the property."  *Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, 571 S.W.3d 346, 363 (Tex. Ct. App. 2018).

Thus, the elements of the TTLA claim and the conversion claim are very similar, except that the conversion claim need not show damages or intent, and the TTLA claim need not show a demand for the laptop's return.

Defendant claims that it is entitled to summary judgment on each claim because there is no genuine dispute as to any of the relevant facts, and because the elements of each claim clearly are satisfied.  Plaintiff claims that *he* is entitled to summary judgment on each claim because (1) there is no indication that Defendant retained any possessory right to the laptop, since Plaintiff was given it while a consultant (not an employee),[19] and (2) Plaintiff has no intention of permanently depriving Defendant of the laptop.  Thus, the first two elements of each claim are in dispute here: whether Defendant had a possessory right to the laptop, and whether Plaintiff unlawfully violated that right.

The court finds that Plaintiff has identified questions of fact that preclude granting summary judgment to either party on either claim.  With respect to Plaintiff's former argument, it is undisputed that the laptop was provided to Plaintiff when he was a consultant, not an employee, and there is no evidence in the record that indicates what was understood about the laptop at the time of its issuance.  Plaintiff asserts, and Defendant does not dispute, that there were no conditions placed upon the possession or use of the laptop, and there is nothing in the record indicating there was any arrangement or agreement as to its return upon the completion of Plaintiff's consultancy, as one might expect there to be for loaned technology.  Similarly, there is no indication that Defendant maintained the laptop or provided antiviral or other software for it, which otherwise might indicate that the laptop was loaned and not outright gifted to Plaintiff. And it does not appear that Defendant sought return of the laptop during the period

---

[19] In support of his arguments, Plaintiff refers to a decision regarding the laptop from then-United States Magistrate Judge (now Circuit Judge) Merriam, but review of a recording of the hearing at which the court pronounced its decision shows that the ruling was narrowly tailored only to deny a motion to compel production of the laptop *for purposes of discovery*.  The court explicitly indicated that it might be appropriate to assert a counterclaim for conversion if Defendant was asserting ownership of the laptop. Therefore, the ruling does not support Plaintiff's position here.

between when Plaintiff's consultancy ended and his employment began.  Moreover, it is not clear that Defendant's employee handbook created an expectation that the laptop would be returned to Defendant, since the technology was not provided to Plaintiff upon his signing of the handbook.  And although Defendant asserts that the handbook shows that the laptop was Defendant's property, it does not; it only shows what must happen with Defendant's property upon separation.  It does not indicate that any technology issued to any employee, before or during their employment, is still considered Defendant's property.  Additionally, Defendant did not seek return of the laptop for nearly two months after Plaintiff left, and (according to Plaintiff), even then, it did so only after Plaintiff began voicing claims regarding his termination.  On the other hand, Plaintiff continued using the laptop once he became an employee, and he states that he has retained it only because of his outstanding claims for reimbursement of expenses, which could indicate to a reasonable juror that he knows it to be Defendant's property.  Accordingly, the court finds that there is a factual issue in dispute as to Defendant's possessory right which precludes granting summary judgment on the conversion claim and the TTLA claim.

A factual issue also exists with respect to intent.  "Relevant intent to deprive the owner of property is the accused's intent *at the time of the taking.*"  *Izen v. Move-It Self Storage, LP*, No. 14-21-00089-CV, 2023 WL 2808119, at *2 (Tex. App. Apr. 6, 2023) (emphasis added) (quoting *Wilson v. State*, 663 S.W.2d 834, 836–37 (Tex. Crim. App. 1984)).  Given the questions surrounding ownership of the laptop, a jury reasonably could find that Plaintiff retained the laptop when Defendant asked for its return, believing he was entitled to do so.  On the other hand, a jury also reasonably could find that Plaintiff

42

retained the laptop believing it to be Defendant's.  Furthermore, given that Defendant apparently asked for return of the laptop at a time when Plaintiff already was discussing his claims with Defendant, it is not clear if Plaintiff intended, at that time, to retain the laptop for a prolonged period of time.  Thus, a factual dispute also remains with respect to intent, which precludes granting summary judgment on the TTLA claim.

Accordingly, viewing the evidence in a light most favorable to the nonmovants, neither party is entitled to summary judgment on the laptop claims.


## IV.    CONCLUSION

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1.    Defendant's Motion for Summary Judgment, ECF No. 138, is **GRANTED in part and is DENIED in part.**

a. Defendant's Motion for Summary Judgment is granted with respect to the following claims:

i.   Plaintiff's claim for breach of contract (only to the extent that the claim is based upon the withholding of a bonus in 2019);

ii.  Plaintiff's claim for wrongful termination; and

iii. Defendant's counterclaim for breach of contract.

b. Defendant's Motion for Summary Judgment is denied with respect to the following claims:

i.   Plaintiff's claim for promissory estoppel (insofar as it relates to the alleged guaranteed bonus for 2018);

     ii.   Plaintiff's claim for breach of the implied covenant of good faith and fair dealing;

    iii.   Plaintiff's claims for fraudulent misrepresentation, and for negligent misrepresentation (insofar as they relate to the alleged guaranteed bonus for 2018);

    iv.   Defendant's counterclaims for breach of fiduciary duty; and

    v.   Defendant's counterclaims for conversion, and for a violation of the Texas Theft Liability Act.

2.    Plaintiff's Motion for Summary Judgment, ECF No. 132, is **GRANTED in part** and **DENIED in part.**

    a.   Plaintiff's Motion for Summary Judgment is granted with respect to Defendant's counterclaim for breach of fiduciary duty.

    b.   Plaintiff's Motion for Summary Judgment is denied with respect to Defendant's counterclaims for conversion, and for a violation of the Texas Theft Liability Act.

**IT IS SO ORDERED** at Hartford, Connecticut, this 8th day of September, 2023.

_____/s/_____

OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE